# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MONISHA PHILLIPS, | * |
| Plaintiff, | * |
| v. | *    Civil Case No.: CCB-15-2066 |
| UNIVERSITY OF MARYLAND, BALTIMORE COUNTY, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Plaintiff Monisha Phillips ("Plaintiff") filed this action against the University of Maryland, Baltimore County ("Defendant"), alleging: (1) disparate treatment on the basis of race, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (2) retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA"). [ECF Nos. 1, 35]. Pending before this court is Defendant's Motion for Summary Judgment. [ECF No. 78]. The issues have been fully briefed [ECF Nos. 78, 81, 82], and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, Defendant's Motion will be granted.

## BACKGROUND

The facts below are taken in the light most favorable to Plaintiff, the non-moving party. Defendant is a publicly-funded institution of the State of Maryland. Pl.'s Am. Compl., [ECF No. 35 ¶ 3]. In or about August of 2008, Plaintiff, an African-American, was hired into Defendant's Department of Psychology as a part-time Administrative Assistant II. Pl.'s Aff., [ECF No. 81-3 ¶ 1]. Plaintiff became a full-time Administrative Assistant II in March of 2010, and served in

that position until she "was involuntarily transferred to Defendant's Enrollment Management Division" in January of 2015. Pl.'s Opp., [ECF No. 81-1 at 4, 8].

As an Administrative Assistant II, Plaintiff's responsibilities included: payroll preparation, procurement, supervision of student office workers, maintaining a staff address list database and personnel files, and contributing "to other administrative needs of the department." [ECF No. 81-12]. Plaintiff avers, however, that her duties often exceeded the scope of her position, and that she performed "higher-level job duties," including: assisting the Department with implementing (and responding to questions regarding) business practices, managing Departmental finances and analyzing expenditures, resolving discrepancies with Defendant's vendors, and coordinating Department projects, including office renovations. Pl.'s Aff., [ECF No. 81-3 ¶ 5]. Moreover, Plaintiff "implemented and/or enforced Defendant's policies within [her] Department. . . , which [exceeded] the scope of the Administrative Assistant II position." Pl.'s Opp., [ECF No. 81-1 at 9]; Pl.'s Aff., [ECF No. 81-3 ¶ 6] (attesting that she introduced the policies that faculty should complete timesheets, that student workers should not receive bonuses, and that new employees had to ensure placement on payroll prior to beginning job duties). Finally, Amy Schneider, a Business Manager in the Department of Psychology, who served as Plaintiff's immediate supervisor from August 2012 through September 2013, testified that Plaintiff performed duties associated with the higher positions of Business Services Specialist and Office Supervisor III. [ECF No. 81-13 at 5, 8]; *see* [ECF No. 81-14] (identifying a Business Service Specialist's primary duties as including: analyzing the Department's revenues and expenditures, coordinating Department renovations, resolving discrepancies with vendors, and evaluating the effectiveness of office operations and implementing changes); [ECF No. 81-15] (identifying an Office Supervisor III's primary duties as including "operat[ing] office

equipment such [sic] personal computers, typewriters, calculators, facsimile machines, and photocopiers.").

Because Plaintiff believed her job responsibilities exceeded the scope of her position, on approximately three occasions, from November of 2011 through August of 2013, she sought "a formal reclassification." Pl.'s Opp., [ECF No. 81-1 at 4-7]. Defendant's "reclassification" process permits the Human Resources Department ("HR") to reclassify an employee's position if his or her "mandatory duties have increased significantly and permanently to higher-levels, so that it has effectively become a new position." Def.'s Mot., [ECF No. 78-1 at 8]; *see also* Dominguez Dep., pp. 16-17, [ECF No. 78-7 at 7] ("[I]t's the position and whether the individual is working within the scope of the duties as assigned to the position" that determines whether a reclassification request is approved). "Reclassification requests may be initiated by the employee or the [D]epartment." Def.'s Mot., [ECF No. 78-1 at 8]; Thomas Dep., pp. 204-05, [ECF No. 78-12 at 44]. Regardless of who initiates the request, however, HR requires that a Classification Action Request ("CAR") form be submitted, outlining the employee's duties and responsibilities. Thomas Dep., pp. 206-07, [ECF No. 78-12 at 45]. If the Department chair or supervisor fails to support a reclassification request, the employee may submit the CAR form directly to Valerie Thomas, Defendant's Associate Vice President for HR, an African-American woman, who is ultimately responsible for determining whether a reclassification occurs. Thomas Dep., pp. 207-09, [ECF No. 78-12 at 45]. Plaintiff was aware that, in order to obtain a reclassification, a CAR form was required. Pl.'s Dep., p. 232, [ECF No. 81-4 at 45] (answering "correct" to the question of whether she was aware that she needed to submit a CAR form to obtain a reclassification). Plaintiff, however, never submitted a CAR form for any of her reclassification requests. Pl.'s Dep., pp. 213-14, 218, 265, 275-76, 282 [ECF No. 78-6 at 32-34,

45, 47, 49] (answering "no" when asked if she submitted a CAR form regarding her 2011, 2012, and 2013 reclassification requests). Ultimately, Plaintiff's reclassification requests were denied.

Plaintiff believes that the denials of her reclassification requests were on the basis of race and as retaliation for engaging in protected activity under Title VII. Pl.'s Opp., [ECF No. 81-1 at 15-17, 27-34]. Specifically, Plaintiff attests that, shortly after beginning her job as a part-time Administrative Assistant II, she overhead Ms. Schneider (Caucasian) state that she "needed to pick up her 'kids' (referring to her niece and nephew) from school because she did not want them to take the school bus with African American children." Pl.'s Aff., [ECF No. 81-3 ¶ 2]. Plaintiff reported the comment to her then-supervisor, Dr. Linda Baker (Caucasian), but Ms. Schneider was not reprimanded. *Id.* Further, because of the increased complexity of her job duties, Plaintiff first sought reclassification via email on November 30, 2011 from Dr. Baker and Marie E. Dominguez, the Assistant Dean of the College of Arts, Humanities, and Social Sciences, which encompasses the Department of Psychology. *Id.* ¶ 3; [ECF No. 81-5]. While the request was pending, in December of 2011, Dr. Baker informed Plaintiff that she "would not get into trouble for making payroll errors because [she is] African-American and a single mother." Pl.'s Aff., [ECF No. 81-3 ¶ 4]. In April of 2012, Dr. Baker and Ms. Dominguez denied Plaintiff's request, relying on the analysis of Patricia Jarkowski (Caucasian), HR's Classification/Compensation Manager. Pl.'s Aff., [ECF No. 81-3 ¶ 3]; [ECF No. 81-5]. Ms. Jarkowski explained that she:

> conducted a review of the duties assigned to Administrative Assistant II, [Plaintiff], with the Psychology Department. [Plaintiff] was hired into this position in August of 2008 to work part-time . . . and manage the department's payroll and enrollment related processes. This office evaluated these duties before [Plaintiff] was hired, and determined that Administrative Assistant II was the appropriate classification. The position provided the type of complex administrative support to the department appropriate to the Administrative Assistant II title.

4

In early 2010, when the department planned to increase the position to full-time, the duties were again evaluated. The position was primarily responsible for payroll preparation and had taken on responsibility for procurement and student supervision. Again it was determined that Administrative Assistant II was the appropriate classification. There are other Administrative Assistant II positions on campus that are responsible for preparing the payroll, procurement, and supervising student workers.

[Plaintiff's] duties continue to be appropriate to the Administrative Assistant II classification. Her duties have not significantly changed since her position was evaluated two years ago.

[ECF No. 81-5 at 1].[1]

Thereafter, Plaintiff spoke with Ms. Thomas, stating her belief "that race played a part in the denial" of the reclassification. Pl.'s Dep., p. 231, [ECF No. 81-4 at 44]. Within days, Ms. Dominguez then "chastised Plaintiff for complaining to Ms. Thomas, told Plaintiff that she would never be reclassified or promoted" and that, because the Department of Psychology did not support reclassification, HR would not support it either. Pl.'s Opp., [ECF No. 81-1 at 5-6]; Pl.'s Dep., pp. 259-61, [ECF No. 81-4 at 59-61]. Upon reporting those comments to Ms. Thomas, she told Plaintiff to simply "disregard [Ms. Dominguez's] reaction." Pl.'s Opp., [ECF No. 81-1 at 6]; Pl.'s Dep., p. 263, [ECF No. 81-4 at 62].

Thereafter, between June and the Fall of 2012, in response to her second request for reclassification (made orally), Ms. Dominguez advised Plaintiff that her request "would not be approved." Pl.'s Opp., [ECF No. 81-1 at 6]; Pl.'s Dep., p. 288, [ECF No. 81-4 at 73]. During this period, in August or September of 2012, "Dr. Baker told [Plaintiff] that African Americans are often 'defensive' and 'sensitive.'" Pl.'s Aff., [ECF No. 81-3 ¶ 9]. Subsequently, in January or February of 2013, Plaintiff orally directed her third reclassification request to Ms. Thomas,

---

[1] Plaintiff appears to claim that, in April of 2012, she made another reclassification request, which was denied. Pl.'s Opp., [ECF No. 81-1 at 5]. However, Plaintiff relies on the same emails that she cited to evidence her November, 2011 request, which was subsequently denied in April, 2012. *See* [ECF Nos. 81-1 at 2-3, 81-5].

who informed Plaintiff that she would speak with Ms. Jarkowski about the reclassification, and that a desk audit could be required. Pl.'s Opp., [ECF No. 81-1 at 6]; Pl.'s Dep., p. 300, [ECF No. 81-4 at 79]. Ms. Thomas, however, never sought a CAR form from Plaintiff, and Plaintiff did not follow up regarding the request until August of 2013. Pl.'s Dep., pp. 300-02, 304, [ECF No. 81-4 at 79-82].

Between February, 2013 and August, 2013, prior to Plaintiff following-up with Ms. Thomas regarding her reclassification, Plaintiff attests that she was the victim of further discriminatory conduct. *See* Pl.'s Opp., [ECF No. 81-1 at 6-7]. First, in March or April, 2013, Dr. Bernard Rabin (Caucasian), a Psychology Professor, requested that Plaintiff join the Laboratory Animal Caretaker Search Committee "because she is a minority." *Id.* at 6; Pl.'s Aff., [ECF No. 81-3 ¶ 11]. Additionally, on April 23, 2013, the manner in which Ms. Schneider handled a potential overpayment received by Joy Thompson, an African-American employee, caused Plaintiff to "complain[] to upper management about the 'hostile work environment' she was experiencing in the Department . . . ." Pl.'s Opp., [ECF No. 81-1 at 7]; [ECF No. 81-6]. Moreover, in approximately June, 2013, in response to Plaintiff's question why Dr. Christopher Murphy[2] could not serve as her immediate supervisor instead of Ms. Schneider, Dr. Murphy stated: "God Dammit. Blacks are burdens, you are bringing all of this on yourself." Pl.'s Opp., [ECF No. 81-1 at 7]; Pl.'s Dep., pp. 315-17, [ECF No. 81-4 at 85-87]. Plaintiff reported Dr. Murphy's comments to Ms. Thomas, who apologized for the comment, informed Plaintiff she (Ms. Thomas) would look into the matter, but "did not [further] address Plaintiff's complaint of discrimination or hostile work environment." Pl.'s Opp., [ECF No. 81-1 at 7]; Pl.'s Dep., p. 318, [ECF No. 81-4 at 88].

---

[2] In August of 2012, Dr. Murphy was appointed Chair of the Department of Psychology, succeeding Dr. Baker, Plaintiff's previous supervisor. Def.'s Mot., [ECF No. 78-1 at 6-7]. Dr. Murphy made certain Departmental changes and assigned Ms. Schneider as Plaintiff's supervisor. *Id.*

In or about August of 2013, Ms. Thomas finally denied Plaintiff's January/February reclassification request, without explanation. Pl.'s Opp., [ECF No. 81-1 at 7]; Pl.'s Dep., pp. 304-05, [ECF No. 81-4 at 82-83]. On or about September 20, 2013, in response to a grievance filed by Plaintiff, the union representative, Mr. George Poovan, indicated to HR that Plaintiff believed that the Department "was treating her differently because of the 'color of her skin.'" Pl.'s Opp., [ECF No. 81-1 at 7]; [ECF No. 81-7]. Mr. Poovan also explained that Ms. Schneider was "strongly bullying" Plaintiff. [ECF No. 81-7]. Plaintiff then filed her EEOC charge on September 24, 2013, alleging that, between March 1, 2011 and September 23, 2013, she was denied reclassification on the basis of race and was subjected to retaliation and a hostile work environment.[3] EEOC Charge, [ECF No. 78-31 at 2]. Thereafter, on October 3, 2013, Ms. Schneider "chastised" Plaintiff for "filing complaints and charges," which Plaintiff contends constituted harassment and retaliation. Pl.'s Opp., [ECF No. 81-1 at 7]; [ECF No. 81-8 at 1]. In December of 2013, in a statement witnessed by Dr. Murphy, Ms. Schneider called Plaintiff an "Angry Black Woman." Pl.'s Aff., [ECF No. 81-3 ¶ 13]. No disciplinary action was taken. *Id.* In February and July of 2014, Plaintiff again complained to management regarding a hostile work environment caused by Ms. Schneider. Pl.'s Opp., [ECF No. 81-1 at 8]. Specifically, Plaintiff contends that Ms. Schneider was "badgering" her and "fostering combative relations." [ECF Nos. 81-9, 81-10]. In January of 2015, Plaintiff was involuntarily transferred to Defendant's Enrollment Management Division. Pl.'s Aff., [ECF No. 81-3 ¶ 14]. Though transferred to a new Division, Plaintiff remained a "Payroll Preparer / Administrative Assistant" and experienced no decrease in salary or benefits. Def.'s Mot., [ECF No. 78-1 at 18-19]; [ECF No. 78-34 at 2].

---

[3] On or about April 18, 2015, Plaintiff received from the EEOC a Notice of Right to Sue. Pl.'s Am. Compl., [ECF No. 35 ¶ 7].

# LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Defendants, as the moving party, bear the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad,* 823 F. Supp. 2d 334, 348 (D. Md. 2011). If Defendants establish that there is no evidence to support Plaintiff's case, the burden then shifts to Plaintiff to proffer specific facts to show a genuine issue exists for trial. *Id.* Plaintiff must provide enough admissible evidence to "carry the burden of proof at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey,* 823 F. Supp. 2d at 349. Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. Plaintiff "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.,* 107 F. Supp. 2d 669, 671 (D. Md. 1999). If Plaintiff fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *see also Casey,* 823 F. Supp. 2d at 348-349. In ruling on a motion for summary judgment, a court must

view the facts and inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## ANALYSIS

Defendant seeks summary judgment on each of Plaintiff's four claims, namely: (1) disparate treatment on the basis of race, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (2) retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA").[4] Def.'s Mot., [ECF No. 78-1 at 4-5]. Plaintiff has failed to oppose Defendant's motion for summary judgment on her FMLA claim.[5] Pl.'s Opp., [ECF No. 81-1]. Thus, summary judgment will be granted on Count IV. *See Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'") (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)). Plaintiff's three remaining Title VII claims are addressed below.

## I. Disparate Treatment / Failure to Promote

Under Title VII, it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). A plaintiff bringing a claim under Title VII "may avert summary judgment . . . through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff can present "direct or

---

[4] Plaintiff first argues that Defendant's motion for summary judgment was untimely filed and, as such, should be dismissed in its entirety. Pl.'s Opp., [ECF No. 81-1 at 13]. Plaintiff's position, however, was rendered moot by Judge Hollander's September 25, 2017, order, which retroactively extended the deadline for filing dispositive motions to June 22, 2017. [ECF No. 83-1].

[5] Apparently UMBC provided Plaintiff FMLA leave for depression, together with vacation and sick leave, with full pay from November 2013 to May 2014. Def.'s Mot., [ECF No. 78-1 at 18].

circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Second, a plaintiff may "proceed under [the *McDonnell Douglas* ] pretext framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 318 (alteration in original) (quoting *Hill*, 354 F.3d at 285) (internal quotation marks omitted). To establish a prima facie claim of discrimination based on race under *McDonnell Douglas*, a plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Further, to establish a prima facie claim of a discriminatory failure to promote, a plaintiff must show that: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004). While Plaintiff frames Count I only as a disparate treatment claim, this court agrees with Defendant that it fundamentally qualifies as a failure to reclassify / promote claim. Nonetheless, because Plaintiff did not apply for reclassification, her claim fails under both standards; Defendant is entitled to summary judgment.

### A. EEOC Subject-Matter Jurisdiction and the Statute of Limitations

As background, this court "lack[s] subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies." *Balas v. Huntington Ingalls*

*Indus., Inc.*, 711 F.3d 401, 406 (4th Cir. 2013) (citation omitted). In determining whether a plaintiff has satisfied "the exhaustion requirement, courts 'may look only to the charge filed with that agency.'" *McCleary-Evans v. Maryland Dep't of Transp.*, No. CIV.A. ELH-12-1550, 2015 WL 1285325, at *19 (D. Md. Mar. 20, 2015), *aff'd*, 631 F. App'x 178 (4th Cir. 2016) (quoting *Balas*, 711 F.3d at 408).[6] Additionally, "Title VII provides that an administrative charge must be filed with the EEOC, at the latest, 'three hundred days after the alleged unlawful employment practice occurred.'" *Dale v. Maryland Dep't of Transp.*, No. CIV.A. ELH-13-191, 2015 WL 221628, at *17 (D. Md. Jan. 15, 2015), *aff'd sub nom. Dale v. Maryland Dep't of Transportation*, 672 F. App'x 323 (4th Cir. 2017) (quoting 42 U.S.C. § 2000e–5(e)(1)). Plaintiff's EEOC Charge, filed on September 24, 2013, alleges that Defendant discriminated against her between March 1, 2011 and September 23, 2013. EEOC Charge, [ECF No. 78-31 at 2]. Thus, alleged acts occurring before November 28, 2012 (300 days prior to the EEOC Charge's date of filing) are barred by limitations.

Plaintiff contends that, because "Defendant's refusal to reclassify Plaintiff in 2011, 2012 & 2013 (a series of discriminatory acts) derived from the same discriminatory animus[,]" her race, the continuing violation doctrine saves her 2011 and 2012 failure to reclassify claims. Pl.'s Opp., [ECF No. 81-1 at 18-19]. Plaintiff is mistaken. In *Nat.'l R.R. Passenger Corp. v. Morgan*, the Supreme Court expressly rejected the continuing violation doctrine for claims involving "termination, failure to promote, denial of transfer, or refusal to hire[,]" holding that these "discrete acts . . . are easy to identify" and "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. 101, 113-14 (2002). Reclassification requests have expressly been held to constitute discrete acts, such that the continuing violation doctrine does not apply. *See Russell v. Ohio*, No. 205-CV-00142, 2007 WL

---

[6] Unpublished cases are cited not as precedent but for the persuasiveness of their reasoning.

11

1731200, at *13 (S.D. Ohio June 14, 2007), *aff'd sub nom. Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386 (6th Cir. 2008) (holding that, because the continuing violation doctrine was not applicable, the Plaintiff's reclassification claim was time-barred); *Riddell v. Slippery Rock Univ.*, No. CIV A 04-108, 2006 WL 2773414, at *12 (W.D. Pa. Sept. 25, 2006) (Pursuant to *Morgan*, "this court cannot recognize . . . discrete acts" such as "the denial of her request to be reclassified"); *Rivas v. U.S. Postal Serv.*, No. CIV. 08-1968 (SEC), 2010 WL 1328992, at *5 (D.P.R. Mar. 25, 2010) (holding that the plaintiff's claim for denial of his reclassification "should not be interpreted as part of a continuing violation because" it qualifies as a discrete act under *Morgan*). As such, here, the continuing violation doctrine cannot save Plaintiff's untimely 2011 and 2012 failure to reclassify claims, because they occurred before November 28, 2012. Accordingly, Plaintiff's disparate treatment / failure to promote claim is limited to her 2013 denied reclassification request. *See* Pl.'s Opp., [ECF No. 81-1 at 16-17].

### B. Defendant's August 2013 Denial of Plaintiff's Reclassification Request does not Constitute an Adverse Employment Action

Pursuant to *Morgan*, Plaintiff's only timely adverse employment action allegation is her 2013 reclassification request, initially requested in January or February and subsequently denied in August. Pl.'s Opp., [ECF No. 81-1 at 6-7]. "An adverse [employment] action . . . constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks and citation omitted). Importantly, "denials of reclassifications . . . may constitute adverse employment actions." *Carter v. Maryland Aviation Admin.*, No. CCB 04-3065, 2006 WL 1892402, at *4 n.10 (D. Md. May 31, 2006). For a denial of a reclassification request to constitute an adverse employment action, however, an employee must first apply for

12

the reclassification. *Hargett v. Fla. Atl. Univ. Bd. of Trustees*, 219 F. Supp. 3d 1227, 1239 (S.D. Fla. 2016) (stating that, because the plaintiff "did not even apply for the reclassification . . . [,] [it was] not a materially adverse action."); *Duffy v. Belk, Inc.*, 477 F. App'x 91, 98 (4th Cir. 2012) (granting summary judgment because the plaintiff failed to apply to the position); *Nichols v. Caroline Cty. Bd. of Educ.*, 123 F. Supp. 2d 320, 328 (D. Md. 2000), *aff'd*, 15 F. App'x 156 (4th Cir. 2001) (same).

In early 2013, Plaintiff met with Ms. Thomas to discuss the potential for her position to be reclassified. Pl.'s Dep., pp. 299-300, [ECF No. 81-4 at 78-79] (testifying that, at their January or February 2013 meeting, Ms. Thomas informed Plaintiff that she [Ms. Thomas] "would look into [her reclassification]."). Plaintiff, however, did not follow up with Ms. Thomas regarding her oral reclassification request until months later, in August of 2013. Pl.'s Dep., p. 302, [ECF No. 81-4 at 81]. Another meeting was scheduled, at which Ms. Thomas informed Plaintiff that her reclassification request "would not be approved." Pl.'s Dep., pp. 303-04, [ECF No. 81-4 at 81-82]. Merely having two oral conversations throughout the course of 2013 is insufficient to satisfy Plaintiff's application requirement. Plaintiff was fully aware that, in order to obtain a reclassification, she needed to submit a CAR form. Pl.'s Dep., p. 232, [ECF No. 81-4 at 45] (answering "correct" to the question of whether she was aware that she needed to submit a CAR form to obtain a reclassification). However, Plaintiff never submitted a CAR form for any of her reclassification requests, including in 2013. Pl.'s Dep., pp. 213-14, 218, 265, 275-76, 282 [ECF No. 78-6 at 32-34, 45, 47, 49] (answering "no" when asked if she submitted a CAR form regarding her 2011, 2012, and 2013 reclassification requests).

Plaintiff's argument that Defendant "inappropriately relied" on "failure to promote" and "failure to hire" cases when arguing that she failed to "properly request a reclassification" is

misplaced. *See* Pl.'s Opp., [ECF No. 81-1 at 16, 19-20]. Plaintiff concedes that if she were reclassified to a higher grade, she would have received an increase in salary. Pl.'s Opp., [ECF No. 81-1 at 17] (stating that the reclassification denial prevented her from receiving "an increase in salary, thereby constituting an adverse job action."). However, "[r]eclassifying a job to increase its pay scale is analogous to affording the opportunity for promotion." *Hargett*, 219 F. Supp. 3d at 1239 (citing *McClintick v. Leavitt*, Civ. No. RDB 05–2880, 2007 WL 927616, at *5 (D. Md. Mar. 26, 2007)). Thus, despite categorizing Defendant's action as a reclassification denial, Plaintiff's failure to submit the required application materials remains fatal to her claim. *See Hargett*, 219 F. Supp. at 1239).

Alternatively, assuming arguendo that Plaintiff could make out a prima facie case, despite her failure to submit the CAR form, Plaintiff cannot rebut Defendant's legitimate, nondiscriminatory reasons for the failure to reclassify. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (explaining that once a plaintiff makes out a prima facie case, and the employer articulates a legitimate, nondiscriminatory reason for its action, the plaintiff must "rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination.") (internal quotation marks and citations omitted). In her email of April 2012, Ms. Jarkowski provided legitimate, nondiscriminatory reasons for denying Plaintiff's reclassification. *See* [ECF No. 81-5]. She explained that Plaintiff's position had been evaluated extensively on multiple occasions, and that her duties "continue[d] to be appropriate to the Administrative Assistant II classification." *Id.* Moreover, Ms. Thomas attested that, as of 2013, Plaintiff's duties remained "not unusual for an Administrative Assistant II position," and that, accordingly, she did not

support a reclassification.[7]  *See* Thomas Aff., [ECF No. 78-16 ¶¶ 9, 12].  Finally, Plaintiff admitted that, throughout her employment within the Department (from 2008-2015), her primary duty was as a payroll preparer.  Pl.'s Dep., pp. 110, [ECF No. 78-6 at 12].  Because Plaintiff has failed to establish a prima facie case that she applied for the reclassification, or, alternatively, to produce evidence to rebut Defendant's nondiscriminatory reasons for the failure to reclassify, summary judgment is appropriate.

## II.  Retaliation

Title VII prohibits an employer from discriminating against an employee because "[s]he has opposed any practice made an unlawful employment practice . . . , or because [s]he has made a charge."  42 U.S.C.A. § 2000e-3 (West).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) the employer took "materially adverse" action against her; and (3) the protected activity and the adverse action were causally connected.  *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).  Plaintiff argues that Defendant retaliated against her for making "numerous verbal and written complaints of discrimination and hostile work environment" to management by denying her request for reclassification in August of 2013.[8]  Pl.'s Opp., [ECF No. 81-1 at 26-31]; Pl.'s Am. Compl., [ECF No. 35 ¶ 75].

---

[7] Moreover, Ms. Thomas, the employee ultimately in charge of granting or denying reclassification requests, is the only person with whom Plaintiff discussed her 2013 request, and is also African-American.  *See Miller-Jones v. Prince George's Cmty. Coll.*, 691 F. App'x 705, 706 (4th Cir. 2017) ("An assertion of pretext is less believable where the selection committee is composed of individuals of the same protected class as the plaintiff.").

[8] Plaintiff also alleges that her denied reclassification request of April 2012 constitutes an adverse employment action.  Pl.'s Opp., [ECF No. 81-1 at 30].  As discussed above, however, claims of retaliation occurring before November 28, 2012 (300 days prior to Plaintiff's EEOC Charge's date of filing) are time-barred and are not subject to the continuing violations exception.  *See supra* Part I.A; *Morgan*, 536 U.S. at 105 (holding that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period.").  Further, in her Opposition, Plaintiff did not respond to Defendant's position that the following actions fail to qualify as adverse employment actions: (1) making

Like Plaintiff's disparate treatment / failure to promote claim, her retaliation claim fails because she did not properly submit an application. As discussed above, despite knowing that a CAR form was required to obtain a reclassification, Plaintiff failed to submit the proper paperwork and relies upon only two oral conversations with Ms. Thomas throughout 2013 to support her failure to reclassify claim. *See supra* Part I.B. Without having applied for a reclassification, Plaintiff cannot prove the "causal nexus" between engaging in protected activity and being denied reclassification. *Miles v. Jaczko*, No. CIV A DKC 2009-0503, 2010 WL 889793, at *10 (D. Md. Mar. 5, 2010) (holding that the "causal nexus" between the protected activity and adverse employment action was missing, because the plaintiff did not "submit an actual application for the [] position."). Alternatively, for the reasons discussed above, *see supra* Part I.B, assuming arguendo that Plaintiff could make out a prima facie case of retaliation, Plaintiff cannot rebut Defendant's legitimate, nondiscriminatory reasons for the failure to reclassify.[9] Summary judgment is thus also appropriate as to the retaliation claim.

### III. Hostile Work Environment

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate that she experienced harassment that was: "(1) unwelcome; (2) based on her race; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an

---

it difficult for her to utilize vacation and sick leave; (2) preventing her from teleworking more than one day per month; (3) causing difficulty in processing purchasing requests made by African-American employees; and (4) on or about September 23, 2013, instructing her to "let go of the past." *See* Def.'s Repl., [ECF No. 82 at 12-14]. Thus, these actions will no longer be considered. *See Cox*, 859 F.3d at 308 ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'") (quoting *Grenier, Inc.*, 70 F.3d at 678).

[9] Plaintiff also argues that her involuntary transfer to the Enrollment Management Division in January 2015 "constitutes background evidence of [Defendant's] retaliatory intent." Pl.'s Opp., [ECF No. 81-1 at 31]. However, Plaintiff's primary duties remained the same and she experienced no decrease in salary or benefits. *See* [ECF No. 78-34 at 2]; *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) ("[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action . . . .") (internal quotation marks and citation omitted).

abusive work environment; and (4) imputable to her employer." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015) (citations omitted). To determine whether conduct is sufficiently severe or pervasive to establish an actionable hostile work environment claim, this court must "'look[] at all [of] the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). A plaintiff must show both that she "subjectively perceive[d] the environment to be abusive" and that "the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks and citations omitted).

Plaintiff argues that she was subjected to a hostile work environment because her coworkers made racially discriminatory comments, which were either directed at her or made in her presence. Pl.'s Opp., [ECF No. 81-1 at 35-36]. Specifically, Plaintiff claims that: (1) as a part-time Administrative Assistant II, she overheard Ms. Schneider inform another coworker that she (Ms. Schneider) "needed to pick up her 'kids' (referring to her niece and nephew) from school because she did not want them to take the school bus with African American children[;]"[10] (2) in December of 2011, Dr. Baker informed her that she (Plaintiff) "would not get into trouble for making payroll errors because [she is] African-American and a single mother[;]" (3) while serving as her supervisor, Ms. Schneider "repeatedly" made disparaging remarks about African-American student assistants, but not Caucasian student assistants; (4) in

---

[10] This allegation necessarily occurred prior to March 2010, the date in which Plaintiff became a full-time Administrative Assistant II. Pl.'s Opp., [ECF No. 81-1 at 4].

September of 2012, Dr. Baker informed her that African-Americans are often "defensive" and "sensitive;" (5) in June of 2013, after asking why he could not serve as her supervisor, Dr. Murphy responded: "God Dammit. Blacks are burdens, you are bringing all of this on yourself[;]" (6) in March or April of 2013, Dr. Rabin requested that she join the Laboratory Animal Caretaker Search Committee because she was a minority; and (7) in December of 2013, Ms. Schneider called her an "Angry Black Woman." Pl.'s Opp., [ECF No. 81-1 at 35-36]; Pl.'s Aff., [ECF No. 81-3 ¶¶ 2, 4, 9, 11, 12, 13].

Taking all of Plaintiff's allegations as true, Plaintiff cannot demonstrate that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. The Fourth Circuit has explained that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Sunbelt Rentals, Inc.*, 521 F.3d at 315. Actionable conduct must be "so extreme as to amount to a change in the terms and conditions of employment." *Id.* (internal quotation marks and citation omitted). Thus, "even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard," nor will "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors," or "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." *Id.* at 315-16 (internal quotation marks and citations omitted); *cf. Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) ("Importantly, however, an isolated incident[] of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious.'") (internal quotation marks and citation omitted).

Here, Plaintiff alleges that she was subject to sporadic discriminatory and offensive remarks by at least three of her coworkers – Drs. Baker and Murphy, and Ms. Schneider. As

Defendant notes, however, Dr. Rabin's comments regarding the Laboratory Animal Caretaker Search Committee, and Ms. Schneider's alleged "repeated[]" disparaging remarks about African-American student assistants, fail to qualify as being objectively racially hostile. First, even if she were invited to participate because of her race, Plaintiff was happy to assist Dr. Rabin's Committee in searching for, and hiring, a new animal caretaker. *See* [ECF No. 78-33 at 2] ("Thanks Bernie! You are so welcome!"); *Boyer-Liberto*, 786 F.3d at 277 ("[T]o prevail on a Title VII claim that a workplace is racially hostile, 'a plaintiff must show that there is [] unwelcome conduct . . . .'"). Second, while Plaintiff alleges that Ms. Schneider made disparaging remarks about African-American students, she concedes that Ms. Schneider never used any racially derogatory language. Pl.'s Dep., pp. 191-92, [ECF No. 78-6 at 28]. Instead, when an African-American student made a mistake, Ms. Schneider would inform Plaintiff that she (Ms. Schneider) thought that the student was "stupid and/or incompetent," but Ms. Schneider would not make those comments to Plaintiff when Caucasian students made mistakes. *Id.* Without more, however, Plaintiff is merely speculating that racial animus produced Ms. Schneider's comments. This is insufficient. *See Cepada v. Bd. of Educ. of Baltimore Cty.*, 974 F. Supp. 2d 772, 784 (D. Md. 2013) (granting summary judgment because the plaintiff "offered no evidence, beyond his speculations, that any of the actions he claim[ed] contributed to a hostile work environment were motivated by racial animus[,]" and noting that "[g]eneral allegations of differential treatment must be substantiated by accounts of specific dates, times or circumstances.") (internal quotation marks omitted); *Sonpon v. Grafton Sch., Inc.*, 181 F. Supp. 2d 494, 503 (D. Md. 2002) ("Plaintiff's mere speculation that [her supervisor] was motivated by racial animus in giving her a written rather than verbal reprimand is not evidence."); *Gilliam v. S.C. Dep't Of Juvenile Justice*, 474 F.3d 134, 142-43 (4th Cir. 2007) (stating that plaintiff's

allegations of dissimilar treatment "provided very few specifics . . . [that] were not supported by any evidence other than her own general statements, which often lacked detail," and that [s]uch assertions, standing alone, are insufficient to sustain an actionable Title VII claim."). Importantly, though required, Plaintiff has failed to provide any "specific dates, times or circumstances" regarding Ms. Schneider's alleged derogatory statements about African-American students.

Moreover, even if all six allegations are considered, six statements in the nearly seven years that Plaintiff was employed within the Department fail to satisfy the severe or pervasive standard. While verbally offensive, the alleged remarks are not physically threatening, or otherwise of such a nature to qualify as "extremely serious," so as to avoid the pervasiveness requirement. *See Pryor*, 791 F.3d at 496-97 (4th Cir. 2015) (holding that two paper notes, each containing racist death threats, could amount to discriminatory changes in the terms and conditions of employment, because "a reasonable jury could properly construe the notes as racially-tinged death threats so severe that it does not matter that they were not pervasive.") (internal quotation marks and citation omitted); *Boyer-Liberto*, 786 F.3d at 270, 280 (holding that a supervisor's "two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment[,]" when coupled with physically intimidating conduct, including: (1) berating the plaintiff so closely that he sprayed her with saliva and she could feel his breath on her face; and (2) threatening "to get [her]" and "make [her] sorry."). Because Plaintiff's alleged isolated incidents are not independently "extremely serious," she cannot otherwise demonstrate that the harassment was sufficiently severe or pervasive to alter the conditions of employment. *See Boyer-Liberto*, 786 F.3d at 277 (stating that the "mere utterance of an ... epithet which engenders

20

offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (internal quotation marks and citations omitted). Defendant is thus entitled to summary judgment on Count III.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, [ECF No. 78], will be GRANTED. A separate Order follows.

Dated: March 2 /2018

_____/s/_____

Catherine C. Blake
United States District Judge